# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| THE AMERICAN BOTTLING COMPANY, | ) |
| | ) |
| | ) |
| Plaintiff, | ) C.A. No. N19C-03-048 AML CCLD |
| | ) |
| v. | ) |
| | ) |
| BA SPORTS NUTRITION, LLC and THE COCA-COLA COMPANY, | ) |
| | ) |
| | ) |
| Defendants. | ) |

**Submitted: December 31, 2020**
**Decided: February 11, 2021**

## <u>MEMORANDUM OPINION</u>

**Upon Plaintiff's Motion to Compel Documents from Defendant Coca-Cola:
GRANTED IN PART**

**Upon Defendant Coca-Cola's Cross-Motion to Compel Documents from
Plaintiff and JAB Holding Co., LLC:
GRANTED IN PART**

Garrett B. Moritz, Esquire, Elizabeth M. Taylor, Esquire of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware, Robert C. Walters, Esquire, Russell H. Falconer, Esquire, and Megan Z. Hulce, Esquire, of GIBSON DUNN & CRUTCHER LLP, Dallas, Texas, Attorneys for Plaintiff The American Bottling Company.

Rolin P. Bissell, Esquire, James M. Yoch, Jr., Esquire, Michael A. Laukaitis, II, Esquire, and Kevin P. Rickert, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP,  Wilmington, Delaware, Michael C. Holmes, Esquire, Craig E. Zieminski, Esquire, and Andrew E. Jackson, Esquire of VINSON & ELKINS LLP, Dallas, Texas, Attorneys for The Coca-Cola Company.

A. Thompson Bayliss, Esquire, Daniel J. McBride, Esquire, of ABRAMS & BAYLISS LLP, Wilmington, Delaware, David H. Bernstein, Esquire, Jyotin Hamid, Esquire, Jared I. Kagan, Esquire, and Matthew J. Petrozziello, Esquire, of DEBEVOISE & PLIMPTON LLP, New York, New York, Attorneys for Defendant BA Sports Nutrition, LLC.

**LEGROW, J.**

The plaintiff contends the Coca-Cola Company ("Coke") tortiously interfered with the plaintiff's distribution agreement with BA and Sports Nutrition, LLC ("Bodyarmor") by requiring Bodyarmor to terminate the distribution agreement as a condition to Coke investing in Bodyarmor. Late in the discovery process, Coke produced an email previously redacted for privilege in which one of Coke's executives recommended proceeding with the investment in Bodyarmor based on Coke's counsel's advice that Bodyarmor had a right to terminate the distribution agreement. Coke then permitted its witness to testify at deposition regarding conversations with counsel about the risk of liability associated with the distribution agreement's termination. The plaintiff argues the email's production and the executive's testimony waived privilege as to Coke's communications with counsel regarding the right to terminate the distribution agreement and the risk of liability associated with termination.

Coke does not seriously contest waiver but seeks to limit the fallout by arguing the Court must cabin the waiver narrowly to one particular topic and only to the advice communicated to Coke's executives. Those limitations largely are inconsistent with the principles of fairness underlying the "at issue" exception to the attorney-client privilege. Coke need not, however, produce communications exchanged exclusively between its external counsel unless those communications reflect or recount counsel's communications with Coke.

1

Coke also filed its own motion to compel, arguing the plaintiff waived privilege over its own analysis of the distribution agreement by (1) arguing that the contract's termination was a "clear" breach, or (2) permitting the plaintiff's witness to testify that he consulted counsel before ultimately concluding Bodyarmor had no termination right. This argument is unpersuasive because the plaintiff has not placed its privileged communications at issue and does not intend to rely at trial on counsel's advice. The plaintiff has, however, narrowly waived privilege regarding the origins and revisions to one due diligence document.

## BACKGROUND

In 2015, Bodyarmor entered into a distribution agreement (the "Distribution Agreement") with the plaintiff, The American Bottling Company ("ABC"). The Distribution Agreement granted ABC the exclusive right to distribute Bodyarmor's products in most of the United States for ten years.[1] Three years later, however, Bodyarmor withdrew from that agreement and granted exclusive distribution rights to The Coca-Cola Company ("Coke").

### A. The Merger and the Coke Deal

Bodyarmor's decision to terminate arose in the early months of 2018, after ABC's upstream parent company, Dr. Pepper Snapple Group, Inc. ("DPSG") announced its intention to acquire Keurig Green Mountain, Inc. ("Keurig") from its

---

[1] Second Amended Complaint ("SAC") ¶¶ 32-33.

parent JAB Holding Company, LLC ("JAB") (the "Merger") and rename itself Keurig Dr. Pepper Inc. ("KDP").[2] ABC alleges in its complaint that Bodyarmor and its Chairman and CEO, Mike Repole, initially supported the Merger. Following the Merger, however, Bodyarmor terminated the Distribution Agreement. Bodyarmor then granted Coke the exclusive right to distribute Bodyarmor's products in exchange for Coke purchasing a fifteen percent stake in Bodyarmor for $300 million (the "Coke Deal").[3] The proceeds of Coke's $300 million investment primarily funded a distribution to Repole and Bodyarmor's management.[4]

When it terminated the Distribution Agreement, Bodyarmor took the position that ABC breached Section 10.2 of the Distribution Agreement by failing to request and obtain Bodyarmor's approval of the Merger.[5] Section 10.2 of the Distribution Agreement provided that ABC could not transfer the Distribution Agreement (or its duties under it) without Bodyarmor's approval, which Bodyarmor could not withhold unreasonably.[6] Bodyarmor contends the Merger effected a transfer of ABC's rights and obligations under the Distribution Agreement. Bodyarmor therefore purportedly could terminate the agreement for "cause" and without paying the liquidated damages it would have been required to pay if it terminated the

---

[2] *Id.* ¶¶ 47-48.
[3] *Id.* ¶ 76.
[4] *Id.* ¶ 105.
[5] *Id.* ¶ 101.
[6] *Id.* ¶ 42.

3

agreement without cause. According to ABC, the Merger did not amount to a transfer of the Distribution Agreement and, even if it did, Bodyarmor had no reasonable basis to withhold its approval.

In its tortious interference claim against Coke, ABC alleges (i) Coke conditioned its investment on Bodyarmor terminating its Distribution Agreement with ABC, and (ii) Coke did so even though it learned during due diligence that Bodyarmor's termination would breach the Distribution Agreement.[7] ABC alleges Coke offered Bodyarmor a premium valuation to induce it to breach the Distribution Agreement. In support of this allegation, ABC alleges Coke (i) refused to pay any termination fees Bodyarmor incurred for terminating the Distribution Agreement, and (ii) insisted that Bodyarmor indemnify Coke for any damages associated with that termination. ABC contends these indemnity provisions and Coke's refusal to accept any liability associated with Bodyarmor's termination of the Distribution Agreement were the key sticking points in negotiations surrounding the Coke Deal.

### B. ABC brings its tortious interference claim

ABC initially filed claims for breach of contract and promissory estoppel against Bodyarmor and a claim for tortious interference against Repole.[8] After conducting discovery, including third-party discovery from Coke, ABC filed an

---

[7] *Id.* ¶¶ 72-73, 131.
[8] The Court recently dismissed the tortious interference claim against Repole for failure to state a claim. *See Am. Bottling Co. v. Repole*, 2020 WL 7787043 (Del. Super. Dec. 30, 2020).

amended complaint asserting a claim for tortious interference against Coke. The parties have exchanged extensive discovery and filed numerous discovery-related motions. Written discovery is now substantially complete, and the parties are in the midst of fact depositions.

ABC points to the Coke Deal's negotiation as evidence that Coke was aware Bodyarmor would be breaching the Distribution Agreement by terminating it. ABC contends Coke actively induced that breach by offering a premium valuation on its investment in Bodyarmor. In its complaint against Coke, ABC relied on a redacted email chain (the "August 10 Email"), between (i) Javier Drucker, a senior member of Coke's mergers and acquisitions team, (ii) Jim Dinkins, the head of Coke's North America division who primarily sponsored the Coke Deal, and (iii) James Quincey, Coke's CEO. In the August 10 Email, Drucker specifically raised the risk that the Distribution Agreement's termination would result in litigation with ABC or DPSG. Dinkins advised that his team was comfortable moving ahead with the deal despite the risk.[9] Quincey agreed and approved the Coke Deal. In the redacted version of the email, part of Dinkins's response was withheld on the basis of attorney-client privilege.

---

[9] *See* SAC ¶¶81-83.

5

## C. Coke reveals privileged communications

On November 11, 2020, ABC deposed Marie Quintero-Johnson regarding the redacted version of the August 10 Email. Ms. Quintero-Johnson was Coke's Vice President of M&A and Drucker's supervisor. Shortly after that deposition, Coke unredacted one sentence of the August 10 Email. In that newly-produced sentence, Dinkins stated he was comfortable moving ahead with the Coke Deal "especially re: point #1 where legal confirmed that [Repole] has the right not to provide consent to KDP given the change of control."[10] Coke then allowed Drucker to testify at his deposition regarding Coke's lawyers' assessment of the risk of liability associated with Bodyarmor's termination of the Distribution Agreement. Drucker testified that Coke's lawyers advised him that the length of the Distribution Agreement's term could affect Coke's exposure to ABC, and that the damages Coke might owe ABC could exceed $140 million.[11] Drucker further stated that Coke's lawyers concluded Coke's exposure risk was "very, very, very, low."[12] Drucker testified there possibly were email discussions between Coke's business leaders and its in-house and external lawyers regarding the liability risk.[13] Drucker, however, could not recall specifics regarding his discussions with lawyers regarding the risks.[14]

---

[10] Pl.'s Mot. to Compel, Ex. K.
[11] Pl.'s Mot. to Compel, Ex. L, Deposition of Javier Drucker (hereinafter "Drucker dep.") at 214-16.
[12] Drucker dep.134. *See also id.* at 212-214.
[13] *Id*. at 134-35, 214-15.
[14] *Id*. at 134-35, 214-15.

ABC promptly took the position that Coke had waived privilege by producing the August 10 Email in unredacted form and by allowing Drucker to testify regarding the legal advice Coke received. When the parties were unable to resolve their dispute immediately, ABC moved to compel.

**D. Coke also moves to compel**

Coke opposed the motion, at least as to the scope of the alleged waiver, while simultaneously filing a cross-motion to compel. In its Motion, Coke argues that if the Court grants ABC's motion, the Court necessarily must conclude that ABC waived privilege over ABC's and JAB's interpretations and analyses of the Distribution Agreement. Coke alternatively argues ABC waived privilege over all versions of (and communications relating to) a chart delineating ABC's various distribution agreements and the effect of the Merger on those agreements. That chart was the subject of a previous Memorandum Opinion issued on May 12, 2020 (the "May Opinion").[15] The relevant factual background is summarized briefly below.

In connection with the Merger, Keurig and JAB retained Ernst & Young and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to represent Keurig and conduct due diligence relating to the Merger. During due diligence, Keurig and its advisors shared with DPSG a draft chart (the "Skadden Chart") that analyzed ABC's

---

[15] *See The Am. Bottling Co. v. Repole*, 2020 WL 2394906 (Del. Super. May 12, 2020). This decision was issued before ABC filed its second amended complaint that asserted a claim against Coke.

7

existing distribution agreements with several beverage companies. The chart included analyses of the Merger's effect on those agreements, including whether the beverage company that was a party to each contract had a consent right triggered by the Merger.[16] The chart included analysis of ABC's Distribution Agreement with Bodyarmor. In the May Opinion, the Court held JAB's decision to share the Skadden Chart with DPSG and ABC before the Merger closed waived privilege over that document and the parties' communications with each other regarding the chart.[17]

The documents produced after the Court issued the May Opinion showed that DPSG's counsel, along with its head of M&A, Lou Prignano, received a copy of the Skadden Chart in March 2018 and added commentary to the chart. Relevant to this case was a comment about whether the Merger triggered a consent right for Bodyarmor. The version of the chart Ernst & Young sent to DPSG indicated Bodyarmor had a prior consent right. When DPSG returned the chart with revisions, however, DPSG changed that column to state it was "[a]rguable whether prior written consent [was] required . . . ."

In its opposition to the previous motion to compel regarding the Skadden Chart, ABC described the Chart as a "confidential draft chart conveying legal advice from outside counsel (Skadden) and seeking information requested by Skadden for

---

[16] *See, e.g.* Coke's Mot. to Compel, Ex. 3.
[17] *The Am. Bottling Co. v. Repole*, 2020 WL 2394906 at *5.

purposes of providing legal advice to JAB regarding the terms of [the Distribution Agreement]."[18]   During his deposition, however, Prignano testified the Skadden Chart was "drafted by accountants."[19]  He further testified that the comment DPSG added stating it was "arguable" whether Bodyarmor had a consent right only meant that Repole "had already started the argument that it was – he had a consent right, so it was being argued."[20]

Coke also questioned Prignano at length about whether he ever believed or concluded that the Merger triggered Bodyarmor's consent right.  Prignano responded that he did not believe Bodyarmor had such a right, and he reached that conclusion based on his review of the Distribution Agreement and his discussions with counsel.[21]  Some of the conversations with counsel that Prignano recalled, however, related to non-privileged discussions between Prignano and Repole or among representatives for DPSG/ABC and JAB/Keurig.[22]

---

[18] ABC's Resp. in Opp. to Defs' Mot. to Compel Skadden Chart (D.I. 404), Ex. C.
[19] Dep. of Lou Prignano, Oct. 5, 2020 (hereinafter, "Prignano dep.") at 189.
[20] *Id*. at 198.
[21] *See id*. at 83-84, 86 ("I read the agreement.  I'm not a lawyer so I consulted with our counsel, and, you know, based on their input and me reading it, I came to the conclusion that Mike did not have a right to consent."), 119, 126-27 ("I had talked to counsel who knows better than me, and, you know, went through the contract, and we had come to the conclusion that it did not have the right to consent."), 203.
[22] *See id*. at 83-84 (testifying about a January 2018 meeting with representatives for JAB or Keurig); *id*. at 118-20 (testifying about a February 2018 meeting with Repole); *id*. at 203 (testifying about a meeting with Repole and stating "I mean, I – like I said, I was face to face with Mike when I did that. . . . And, again, I'm not an attorney. . . . There's a contract out there that should be read by lawyers and interpreted.  So I have to rely on their expertise and say that Mike did not have a right to consent.").

Prignano offered this testimony in early October 2020, but Coke did not argue until December 7, 2020 that Prignano's testimony waived privilege. Coke only filed its motion after ABC filed its privilege motion. Coke did not disguise that its motion to compel was reactionary, arguing that "to the extent the ABC Motion is granted, ABC and its affiliates should be required to make an analogous production of privileged documents."[23]

## PARTIES' CONTENTIONS

In support of its Motion to Compel, ABC argues Coke waived its attorney-client privilege by producing the August 10 Email without redactions and by allowing Drucker to testify regarding the substance of Coke's lawyers' analysis. ABC argues both the selective waiver doctrine and the at-issue exception to privilege apply in this case, and that the August 10 Email and Drucker's testimony waive privilege as to: (1) the risk that Coke's requirement that Bodyarmor terminate the Distribution Agreement would result in liability; and (2) whether the Merger constituted a change in control of ABC or otherwise gave Bodyarmor a right to terminate the Distribution Agreement.[24] Coke concedes some degree of waiver has occurred but contends ABC's definition of the scope of the waiver is too expansive. Coke argues the waiver was limited to what Coke's lawyers told Coke's

---

[23] Def.'s Cross-Motion to Compel Documents from ABC and JAB Holding Co., LLC at 2.
[24] *See* Pl.'s Mot. to Compel at 1.

10

businesspeople regarding the lawyers' interpretation of the Distribution Agreement and the risk that Bodyarmor's termination would breach that agreement.[25] Coke further contends certain categories of documents that ABC seeks exceed the scope of the waiver.

As to its own motion, Coke argues Prignano's testimony placed at issue ABC's and JAB's interpretations and analyses of the Distribution Agreement and further waived privilege as to all versions of the Skadden Chart and all communications related to the chart.[26] Coke contends Prignano's testimony that he concluded there was no consent right based on his discussions with counsel raises the same concerns about fairness that ABC relies on in its own motion to compel. Coke also argues Prignano placed the Skadden Chart, its origins, and revisions at issue by testifying about the meaning and significance of statements in the chart.

ABC responds that Prignano did not testify about the substance of his communications with counsel and, in any event, ABC does not intend to rely on counsel's advice to present its claims at trial. As to the Skadden Chart, ABC argues it has produced all the chart-related documents it was required to produce under the May Opinion, and Coke has more than enough to allow it to test Prignano's testimony regarding the chart's origins and the meaning of various entries.

---

[25] Def.'s Resp. in Opp. to Pl.'s Mot. to Compel 6-7.
[26] Def.'s Cross-Motion to Compel, Proposed Order.

## ANALYSIS

Delaware law shields from discovery confidential communications made for the purpose of facilitating the rendition of professional legal advice.[27] The rule promotes unfettered communication between clients and their lawyers.[28] There are, however, exceptions to the privilege, and its protections may be waived. In this case, the parties' motions rely on two similar exceptions to the attorney-client privilege: (1) partial waiver, and (2) the "at issue" exception.

Under the doctrine of partial waiver,[29] "disclosure of even a part of the contents of a privileged communication surrenders the privilege as to those communications."[30] The waiver is "partial" because it is limited to the subject matter of the disclosed communication.[31] The extent of the waiver is guided by principles of fairness and the aim of preventing a party from using privilege as "a litigation weapon."[32]

---

[27] Del. R. Evid. 502; *Ramada Inns, Inc. v. Dow Jones & Co., Inc.*, 523 A.2d 968, 971 (Del. 1986).
[28] *Zirn v. VLI Corp*, 621 A.2d 773, 781 (Del. 1993).
[29] ABC's motion refers to this as "selective waiver," but that phrase typically refers to a different type of waiver not applicable here. *See In re Straight Path Commu. Inc. Consol. S'holder Litig.*, 2020 WL 3171373 (Del. Ch. June 15, 2020); *Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622 (Del. Ch. Nov. 13, 2002). So as not to confuse the issue, the Court uses the term "partial waiver" to refer to the decision to waive a portion of privileged communications. *See, e.g. Citadel Holding Corp. v. Roven*, 603 A.2d 818 (Del. 1992); *E.I. DuPont de Nemours and Co. v. Admiral Ins. Co.*, 1994 WL 89447 (Del. Super. Feb. 15, 1994).
[30] *Citadel Holding Corp.*, 603 A.2d at 825; *Zirn*, 621 A.2d at 781.
[31] *Citadel Holding Corp.*, 603 A.2d at 825; *Admiral Ins. Co.*, 1994 WL 89447 at *2.
[32] *Zirn*, 621 A.2d at 781-82; *Citadel Holding Corp.*, 603 A.2d at 825.

The "at issue" exception to attorney-client privilege applies if a party (1) injects privileged communications into the litigation,[33] or (2) injects an issue into the litigation, the truthful resolution of which requires disclosure of privileged communications.[34] "If either condition is met, the [C]ourt has the discretion to order disclosure of additional documents in the interest of fairness," even if the disclosing party did not intend to waive the privilege.[35] As with partial waiver, the "at issue" exception is animated by fairness principles and an intent to prevent privilege from being used as both a shield in discovery and a sword in litigation.[36]

**A. Coke waived privilege as to two categories of communications.**

After asserting privilege over Dinkins's statement in the August 10 Email, Coke decided late in the discovery process to produce that email without redacting Dinkins's statements about Coke's counsel's conclusion that Repole had the right to

---

[33] I will acknowledge a certain "squishiness" in the difference between partial waiver and the first prong of the "at issue" exception. Some cases refer to partial waiver without referring to the "at issue exception." *See Citadel Holding Corp.*, 603 A.2d at 825; *Zirn*, 621 A.2d at 781-82. Others refer to both doctrines as distinct concepts. *See Hoechst Celanese Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 1995 WL 411805, at *3-4 (Del. Super. Mar. 17, 1995). Still others seem to refer to the first prong of the "at issue" exception as a partial waiver. *See, e.g. TCV VI, L.P. v. TradingScreen Inc.*, 2015 WL 5674874, at *3 (Del. Ch. Sept. 25, 2015). In my view, the first prong of the "at issue" exception seems to overlap completely with the concept of partial waiver. For purposes of this case, the distinction (to the extent there is one) is academic. Although I am not satisfied that it is the correct way to frame the concept, I briefly discuss the two doctrines separately because that is how both parties presented their arguments. My analysis in this case relies on the "at issue" exception.

[34] *Amirsaleh v. Board of Trade of City of New York, Inc.*, 2008 WL 241616, at *3 (Del. Ch. Jan. 17, 2008).

[35] *TCV VI, L.P.*, 2015 WL 5674874, at *2.

[36] *Id*.

withhold consent to the Merger. Coke then allowed Drucker to testify about legal advice Coke's executives received regarding the risk that Coke would incur any liability as a result of Bodyarmor's termination of the Distribution Agreement. There is no persuasive argument that these disclosures, which were intentional and calculated on Coke's part, did not constitute a waiver of the privilege under the "at issue" exception. Coke does not waste time arguing otherwise.[37] Instead, the parties' disagreement revolves around the scope of the waiver.

### i. The waived subject matter

First, the parties disagree about the subject matter over which Coke waived privilege. ABC contends Coke waived privilege as to (1) "the risk that Coke's requirement that Body[a]rmor terminate [the Distribution Agreement] would result in liability"; and (2) whether the Merger "constituted a change of control or otherwise gave Body[a]rmor the right to terminate" the Distribution Agreement.[38] Coke, on the other hand, argues ABC has defined the scope of the waiver too broadly. Coke contends the waiver was limited to "what [Coke's] businesspersons approving the Coke [Deal] were told about counsel's interpretation of the Distribution Agreement and the risk that Body[a]rmor's termination would breach

---

[37] Coke conceded in its brief and at oral argument that it was not contesting the fact that it waived privilege. *See* Def.'s Resp. in Opp. to Pl.'s Mot. to Compel at 1.

[38] Pl's Mot. to Compel, Proposed Order, ¶ 2.

that agreement."[39] The distinction between the parties' definitions is not pronounced. Rather, the parties' differences largely boil down to whether the scope is limited solely to what counsel told Coke's executives.

Limiting production exclusively to what Coke's businesspersons were told unfairly circumscribes the waiver. This Court has discretion to define the scope of a waiver in the interests of fairness and as specific circumstances require.[40] Part of the purpose of the "at issue" exception is to discourage the use of privilege as a litigation weapon. On the other hand, the Court must endeavor to avoid creating a "slippery slope" that would extend waiver beyond the waiving party's intent or the dictates of fairness.[41] Limiting the waiver only to what Coke's businesspersons were told would prevent ABC from meaningfully exploring Coke's knowledge, the scope of the advice it received, and the bases for that advice. In contrast, ABC's definition of the waiver's scope fairly meets the content of the disclosed August 10 Email and Drucker's deposition testimony.

### ii.    Communications with Coke's external lawyers

Coke next contends that discussions between and among its in-house counsel and its external counsel, DLA Piper, are outside the waived subject matter and therefore remain privileged. This argument rests in part on Coke's contention that

---

[39] Def.'s Resp. in Opp. to Pl.'s Mot. to Compel at 6-7.
[40] *TCV VI, L.P.*, 2015 WL 5674874, at *3.
[41] *See Citadel Holding Corp.*, 603 A.2d at 825; *TCV*, 2015 WL 5674874, at *6.

the scope of the waiver is confined to what Coke's businesspersons were told about the risks. As set forth above, this Court disagrees with that premise. Moreover, knowledge or information conveyed to Coke's in-house counsel arguably may be imputed to Coke, even if the information never was conveyed to Coke's businesspersons.[42]

Internal discussions exclusively between DLA Piper attorneys, however, arguably should be subject to different treatment. First, frank and open discussions between attorneys is the *sine qua non* of effective legal advice, and this Court always is reluctant to chill such discussions. Second, discussions or analyses exclusively shared among Coke's external counsel that do not reflect what information or advice was conveyed to Coke is not relevant to ABC's tortious interference claim because it does not address Coke's knowledge or state of mind. On the other hand, Drucker acknowledged in his deposition that some legal advice may have been conveyed in person or by phone.[43] It therefore is possible that internal DLA Piper communications reflect or recount the legal advice that was provided in those formats.

---

[42] *See Roberts v. N. Ins. Co. of NY*, 2009 WL 1482231, at *4 (Del. Super. May 6, 2009); *Ocean Drilling & Exploration Co. v. Pauley Pan Am. Petroleum Co.*, 1965 WL 90028, at *2 (Del. Super. Dec. 10, 1965).

[43] Drucker dep. at 134-35.

Accordingly, in addition to privileged communications with Coke's businesspeople, the scope of the waiver shall include (1) communications between and among Coke's in-house lawyers relating to the subject matter of the waiver, (2) communications between Coke's in-house lawyers and DLA Piper attorneys regarding the subject matter of the waiver, and (3) communications between and among DLA Piper attorneys to the extent they reflect or recount discussions with Coke relating to the subject matter of the waiver. Coke shall review and produce responsive documents maintained by DLA Piper[44] and the three in-house counsel custodians identified in ABC's motion.[45]

### iii. Other limitations on Coke's waiver

Coke further argues it should not be required to produce any communications made before its attorneys received a copy of the Distribution Agreement, since such communications could not reflect Coke's analysis of that agreement. ABC disagrees, arguing that even before it received the Distribution Agreement, Coke could have (and did) discuss the risk that Bodyarmor's termination of the agreement

---

[44] The parties previously agreed to limit the privilege logs each side would be required to prepare for documents within their external lawyers' custody. Accordingly, the privilege log Coke provided for DLA Piper's documents was not detailed. Coke's recent waiver, however, changed the landscape. The parties therefore should negotiate a new protocol for logging DLA Piper's documents. I am confident counsel can agree to a reasonable compromise that properly balances Coke's burden with ABC's interest in testing Coke's additional production.

[45] Coke argued only one of these three custodians was charged with reviewing the Distribution Agreement. ABC, however, identified privilege log entries that suggest the other two custodians also were involved in at least some communications relating to the waived subject matter. Accordingly, Coke must collect and produce responsive documents from all three custodians.

would constitute a breach.  Again, Coke's proposed limitation unfairly would limit ABC's ability to explore the opinions Coke's counsel offered and how those opinions changed (if at all) over time.  Although there may be minimal evidentiary weight ultimately accorded to Coke's counsel's analysis predating its receipt of the Distribution Agreement, that issue is separate from the Court's task of defining the waiver's scope.[46]

Coke fares better with its argument that the waiver should not include legal advice Coke received regarding the indemnity provisions (the "Indemnity Clauses") that Coke and Bodyarmor agreed to in connection with the Coke deal.  Coke contends the Indemnity Clauses amount to nothing more than risk allocation and they neither evince wrongdoing nor indicate the likelihood of a risk materializing.[47] ABC responds that Coke cannot define its waiver so narrowly, particularly because the Indemnity Clauses' "genesis and implementation . . . reflect Coke's knowledge that its conduct could result in liability to ABC."[48]  ABC's contention that all communications relating to the Indemnity Clauses fall within the scope of the waiver

---

[46] On the other hand, ABC argued in its Motion that the waiver should include "[d]ocuments created after ABC commenced this action against Bodyarmor (but before the addition of Coke as a defendant) and reflecting or discussing the legal advice regarding the Subject Matter."  Pl.'s Mot. to Compel, at 9. Here, ABC gets too greedy.  Once litigation had commenced, any discussions between and among Coke and its counsel regarding the waived subject matter are not relevant to what Coke knew or believed when it allegedly tortiously interfered with the contract.  This is precisely the "slippery slope" this Court must avoid, and this request therefore is denied.

[47] Def.'s Resp. in Opp. to Pl.'s Mot. to Compel at 9.

[48] Pl.'s Reply in Supp. of Mot. to Compel at 4.

far exceeds the bounds of fairness or reason.  Communications exclusively relating to the wording or parameters of indemnification are privileged and are not relevant to Coke's advice of counsel defense.  There may, however, be communications that discuss indemnity in conjunction with the waived subject matter.  Accordingly, Coke must permit discovery into all communications within the waived subject matter, even if the communications also discuss or relate to the Indemnity Clauses.  Coke may continue to claim privilege over communications that relate exclusively to the Indemnity Clauses and do not reference the waived subject matters.

## B. Prignano's testimony waived ABC's privilege as to the Skadden Chart.

In its cross-motion to compel, Coke argues ABC broadly has waived privilege over all ABC's and JAB's legal analyses of the Distribution Agreement because ABC placed those analyses at issue in this case.  Coke offers a second, more nuanced, waiver argument as to Prignano's testimony regarding the Skadden Chart.  Although Coke's broad waiver argument is unpersuasive, Prignano's testimony about the origins and meaning of the Skadden Chart did effect a limited privilege waiver.

### i.    ABC has not waived privilege regarding its legal analyses of the Distribution Agreement.

Coke's broad waiver argument is premised on its view that ABC's contention that Coke waived privilege must be applied uniformly, and that if the Court adopts

ABC's position it also must find that ABC similarly has waived privilege. Coke's argument misses the mark in several respects. First, and most fundamentally, Coke's conduct in disclosing the August 10 Email and intentionally allowing Drucker to testify regarding the content of Coke's counsel's advice differs materially from Prignano's testimony that he consulted with counsel and reviewed the Distribution Agreement before concluding Bodyarmor did not have a termination right triggered by the Merger. Unlike Prignano, who did not reveal the substance of ABC's counsel's communications, Drucker testified intentionally and openly about the content of counsel's advice, a fact Coke does not deny. Moreover, most of Prignano's testimony actually related to non-privileged communications he had with Repole or JAB.[49]

Second, ABC does not seek to rely on its counsel's advice to support its claims in this case. ABC has represented to Coke and the Court that "the privileged communications Prignano alludes to in his testimony will be no part of ABC's trial proof," and "ABC does not intend to introduce testimony about internal communications with its counsel."[50] Coke, on the other hand, intentionally waived privilege as to the comments in the August 10 Email and has signaled its intent to rely on its counsel's advice to defend the tortious interference claim. This difference

---

[49] S*ee* fn 22, *infra*.

[50] Pl.'s Resp. in Opp. to Coke's Cross-Mot. to Compel at 5, 8. The Court will hold ABC to those representations.

20

is significant to the Court's analysis because Coke's intent to rely on its counsel's advice implicates the fairness concerns underlying the "at issue" exception and raises the possibility that Coke could use the privilege as a litigation weapon.

Finally, Coke argues in passing that ABC placed its counsel's advice at issue simply by arguing that Bodyarmor's termination of the Distribution Agreement was a "clear" breach of contract. This argument, if accepted, effectively would mean that any party bringing a tortious interference claim has waived privilege over its own legal analysis of the contract at issue. That result finds no support in the case law and is inconsistent with the purpose of the "at issue" exception. ABC's analysis has no relevance to Coke's knowledge or state of mind, and its disclosure is not necessary to allow Coke fairly to defend the claim against it.

### ii. Prignano's testimony waived privilege as to ABC's and DPSG's communications regarding the Skadden Chart.

Prignano's testimony, however, did place at issue the versions of the Skadden Chart within ABC's or DPSG's possession and waived privilege as to ABC's or DPSG's communications with counsel concerning the Skadden Chart. By testifying about who he believed prepared the chart and the reasons for or meaning behind DPSG's revisions to the chart, Prignano placed the Chart's origins and DPSG's revisions to it at issue in this case. The dictates of fairness require that Coke be permitted to explore and test that testimony.

This Court already ruled that any versions of the Skadden Chart shared with ABC or DPSG are not privileged, and it does not appear ABC is withholding any such versions.[51] But, ABC also must produce ABC's and DPSG's privileged communications with their counsel regarding the Chart. On the other hand, Prignano is not JAB's agent, and he therefore could not waive JAB's privilege over its communications with its counsel.[52] Accordingly, the "at issue" waiver over the Skadden Chart and the communications relating to it are limited to ABC's and DPSG's privileged communications.[53]

## CONCLUSION

For the reasons set for herein, ABC's Motion to Compel is **GRANTED IN PART**, and Coke's Cross-Motion to Compel is **GRANTED IN PART**.

**IT IS SO ORDERED.**

---

[51] *See* Ltr. to Court from G. Moritz, Esq. dated Dec. 31, 2020.

[52] *CFTC v. Weintraub*, 471 U.S. 343, 348 (1985) ("for solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors.").

[53] As explained in the May Opinion, communications between JAB/Keurig and DPSG/ABC regarding the Skadden Chart were not privileged before the Merger closed because the parties did not have a common interest. *American Bottling Company*, 2020 WL 2394906, at *5. The Court assumes there were no such communications after the Merger closed since due diligence was complete by that time. If that assumption is misplaced, ABC should so advise Coke. The parties may seek the Court's assistance if they are unable to resolve any disagreements on this issue.

22